REUBEN H. FARNHAM, as Supervisor, etc., Appellant, *v.* CHARLES H. BENEDICT, Respondent.

Under the general railroad act (chap. 140, Laws of 1850) the mere filing of articles of association does not constitute a corporation *de jure*. There must be a performance of the conditions precedent, *i. e.*, a stock subscription of at least $1,000 for every mile of railroad proposed to be constructed, and a payment thereon of ten per cent in good faith and in cash.

Where, therefore, the subscriptions to the capital stock of a proposed railroad corporation were less than the amount required, and the subscribers paid no portion of their subscriptions in cash, but some of them gave their notes for ten per cent of their subscriptions and others gave checks; some upon banks in which they had no accounts or deposits, it being understood between them that the notes and checks were not to be collected but were to be returned, and three of their number, who were named as directors in the articles of association, made and annexed to said articles an affidavit as required by the act, to wit, that the amount of stock had been subscribed and ten per cent in good faith paid thereon in cash ; which articles, with the affidavit, were filed in the office of the secretary of state. *Held*, that no corporation was in fact organized.

Under the town bonding act of 1869 (Chap. 907, Laws of 1869) the existence of a railroad corporation having power to issue stock or bonds, and to construct the road to be aided, lies at the foundation of the power to issue the municipal bonds.

Accordingly, *held*, that bonds of a town, issued for the stock of a pretended corporation fraudulently organized as above stated, were invalid save in the hands of *bona fide* holders.

The articles of association were filed in 1870; no movement was made to begin the construction of the road within five years thereafter as required by the act of 1867 (Chap. 775, Laws of 1867). *Held*, that, assuming the organization had a legal existence as a corporation, and that the bonds were lawfully issued and delivered to it, the default in beginning the construction caused its corporate powers to cease and terminate, and deprived the stock issued to the town of any value; .

and, therefore, that as the consideration for the bonds had failed they were void except in the hands of *bona fide* holders.

Also, *held*, that an action was maintainable on behalf of the town, by its supervisor, to recover damages against one of the persons who made the false affidavit, and, who, with full knowledge of the fraud, had instigated, and as attorney conducted, the proceedings for bonding the town, and, having, in the character of an officer of the pretended corporation, obtained possession of the town bonds, after the five years had expired for beginning the construction of the road, had sold the bonds to *bona fide* holders, who purchased in reliance upon the representations of defendant, that the bonds were good and valid securities, and thus had rendered the town liable thereon.

*It seems*, the fact that the persons signing the petition for bonding the town were well acquainted with the facts relating to the organization of the pretended corporation, would not affect defendant's liability in such an action; as, by procuring the town to be bonded, the petitioners not only imposed a burden on their own property, but on that of other taxpayers who did not sign or approve of the scheme, and who were at liberty to contest the validity of the bonds, until by defendant's action the town lost the right to avail itself of this defense.

Also, *held*, that the act of 1875 (Chap. 598, Laws of 1875), passed after the forfeiture and before the negotiation of the bonds by defendant, did not cure the forfeiture; that the act only applies to a default in failing to complete the road within ten years.

Also, *held*, the fact that defendant accounted to the pretended company for the proceeds of the bonds was not a defense.

*It seems*, that immediately on the negotiation of the bonds a cause of action accrued in favor of the town, either in the nature of an action of trover for the face of the bonds, or as for money had and received, for the money realized by him on the sale.

Also, *held*, that defendant's liability was not affected by an act passed in 1880 (Chap. 577, Laws of 1880), purporting to release the company from the forfeiture of its charter by reason of its failure to begin the construction of the road within five years; that the said act did not have the retroactive effect to take away a right of action which accrued in 1875.

*It seems*, the act last mentioned is violative of the constitutional provision (State Const. art. 3, § 18), prohibiting the legislature from passing any local or private act granting to any corporation or association the right to lay down railroad tracks.

*Farnham* v. *Benedict* (39 Hun, 22) reversed.

(Argued March 9, 1887; decided October 18, 1887.)

APPEAL from judgment of the General Term of the Supreme Court in the fifth judicial department, entered upon an order

made January 5, 1886, which affirmed a judgment in favor of defendant, entered upon the report of a referee. (Reported below, 39 Hun, 22.)

This action was brought by plaintiff, as supervisor of the town of Attica, in the county of Wyoming, to recover damages alleged to have been sustained by said town by reason of certain fraudulent and unlawful acts on the part of the defendant, set forth in the complaint, the substance of which, as well as the facts as found, are stated in the opinion.

*L. W. Thayer* for appellant. The defendant was personally liable to the town for the damages arising from the sale of the bonds. (*Comstock* v. *Hill*, 73 N. Y. 268; *Thayer* v. *Manley*, id. 305; *Town of Ontario* v. *Hill*, 99 id. 324; *Decker* v. *Matthews*, 12 id. 313.) Whoever does an injury to another is liable in damages to the extent of that injury, whether it is to his property, person, rights or reputation. (*Dexter* v. *Spear*, Mason, 115; Sedgw. on Meas. of Dam. 22; *Hynes* v. *Patterson*, 95 N. Y. 1.) The false affidavit was not only a crime but a fraud upon the people, the town and the Secretary of State; and no valid town bonds could be issued to aid in the construction of the road. (*Ex. Grain B. Co.* v. *Stayner*, 25 Hun, 91; *Durant* v. *Abendroth*, 69 N. Y. 152; *Mid. R. R. Co.* v. *Van Horn*, 57 id. 474; *In re Syr. Che. & N. Y. R. R. Co.*, 91 N. Y. 1; *Beach* v. *Smith*, 30 id. 116; *B. R. & U. R. R. Co.* v. *Clark*, 25 id. 208; *O. R. & C. R. R. Co.* v. *Frost & Spriggs*, 21 Barb. 541; *L. O., etc., R. Co.* v. *Mason*, 16 N. Y. 457; Laws of 1871, chap. 925; *Barnes* v. *Brown*, 80 N. Y. 527.) It required no adjudication to end the existence of the company. (*In re B. W. & N. R. R. Co.*, 72 N. Y. 248.) The sale of the bonds by the defendant, at their par value, to Fisher, Pickard & Gardner, who were *bona fide* purchasers for value, rendered the town liable to pay them in full. (*Comstock* v. *Hier*, 73 N. Y. 269; *Murray* v. *Burling*, 10 John. 180; *Decker* v. *Matthews*, 12 N. Y. 313–319; *Thayer* v. *Manley*, 73 id. 305; *Ontario* v. *Hill*, 33 Hun, 250.) In case the company had been legally organ-

ized on the 28th day of February, 1870, it ceased to be such on and after the 27th day of February, 1875. (*In re B. W. & N. R. R. Co.*, 72 N. Y. 245; Laws of 1867, chap. 775, § 1.) Chapter 577, Laws of 1880, simply relieved the company from the forfeiture of its charter by reason of its failure to expend the ten per cent in five years, or the completion of the road in ten years, which had then expired. (Const. § 18, art. 3; *In re B. W. & N. R. R. Co.*, 72 N. Y. 245; 75 id. 335.)

*W. F. Cogswell*, for respondent. The payment of the ten per cent was not necessary to complete the organization. (*O. R. & C. R. R. Co.* v. *Frost*, 21 Barb., 541; *L. O. R. R. Co.* v. *Mason*, 16 N. Y. 451; *Beach* v. *Smith*, 30 id. 116.) The consequences of the company's neglect to enter upon the construction of its road within five years from the filing of its articles were cured by chapter 598 of the Laws of 1875 by which it is provided that an omission of any road to construct its railroad within the period of five years shall not cause a forfeiture of its corporate powers. (Laws of 1875, p. 730; *In re B. W. & N. R. R. Co.*, 72 N. Y. 245, 250.)

RAPALLO, J. This case comes up on the findings of the referee. The evidence is not contained in the case.

The cause of action claimed on the part of the plaintiff to have been established by the facts found, is, in substance, that in the month of September, 1875, the defendant having in his possession, without title, certain bonds of the town of Attica, which purported to have been issued pursuant to the town bonding acts, to aid in the construction of a proposed railroad pretended to have been incorporated under the name of the Attica and Arcade Railroad Company, sold and delivered such bonds to certain persons who purchased them in good faith, and paid to the defendant the full par value thereof in money, upon his assurance and believing that they were in all respects lawful and valid, and a legal indebtedness of the town of Attica. That until the bonds were then placed by the defendant in the hands of *bona fide* holders they were

absolutely void, and did not constitute any indebtedness, and could not have been enforced against said town, but that by transferring them to *bona fide* holders for value he rendered them valid and binding upon the town, and enabled such holders to recover judgments thereon against the town, which, in an action brought by one of such bond holders, it was decided by the Circuit Court of the United States that they could do, and that the town was thus obliged to pay and did pay the full amount of said bonds to such *bona fide* holders. That at the time of so negotiating said bonds and receiving the proceeds the defendant knew the facts which rendered the bonds void, except in the hands of *bona fide* holders, and knew that they could not have been enforced by him, or the railroad company, or any other person until he thus placed them in the hands of *bona fide* holders. That he had been actively instrumental in the organization of the pretended railroad company, and knew it to be a sham organization, formed without compliance with the requirements of the general railroad law, and gotten up fraudulently for the purpose of being used to initiate proceedings for the issue of town bonds, such organization having been based upon a false affidavit knowingly made by the defendant. That he had instigated, and, as an attorney of the Supreme Court, had conducted the subsequent proceedings for bonding the town, and had obtained possession of the bonds from the railroad commissioners in the character of vice-president of the pretended railroad corporation, and had sold them to *bona fide* holders and received the proceeds, on his assurance that they were valid securities and had thus rendered the town liable thereon.

The grounds upon which the bonds are claimed to have been void, except in the hands of *bona fide* holders, are, *first,* that the pretended organization of the Attica and Arcade Railroad Company was fraudulent and void; *secondly,* that even if the company had ever been legally organized its corporate existence had ceased before the sale by him of the bonds, and the stock of said corporation, which had been issued to the town as the consideration for the bonds, had thus become

absolutely worthless, and the consideration had thus wholly failed.

The facts relating to the pretended organization of the railroad company are found by the referee to have been as follows: On the 24th of February, 1870, the defendant and other citizens of the county of Wyoming met and subscribed written articles of association, stating that in pursuance of the general railroad law of 1850, they formed a company for constructing and operating a railroad from the village of Attica to the village of Arcade, in Wyoming county, to be named the "Attica and Arcade Railroad Company." That the length of the road, as near as could be stated, was to be twenty-five miles, and the capital stock $250,000, to be divided into 2,500 shares of $100 each. The articles then set out the names of the defendant and twelve other persons as the directors for the first year. At the same time the defendant and others subscribed for 241 shares of stock amounting to $24,100, and thereupon the defendant and two others of those named as directors, made and swore to the affidavit required by the second section of the general railroad act, viz. : that the amount of stock required by said second section had been subscribed and ten per cent in good faith paid thereon in cash to the directors named in the articles. The articles of association, with such affidavits annexed, were filed in the office of the Secretary of State, on the 28th of February, 1870.

The affidavit was false in every particular. The act required that before the articles should be filed at least $1,000 of stock for every mile of railroad proposed to be made should be subscribed, and ten per cent paid thereon, in good faith and in cash, to the directors named in the articles, and that an affidavit of these facts should be indorsed on or annexed to the articles; whereas in point of fact, at the time the affidavit was sworn to only $24,100 of stock had been subscribed, the length of the proposed road being twenty-five miles, and no part of the amount subscribed had been paid in cash, or ever has been paid.

The referee also finds that the falsity of the affidavit was well known to the defendant at the time he swore to it; that

the pretended payments were made by the delivery to a person named as treasurer of said company of the checks, and, in two or more instances, the promissory notes of the subscribers for ten per cent of their subscriptions; that at the time the said checks and promissory notes were so given and received in payment of said ten per cent, it was publicly stated that they could be used, and was so stated by the defendant; that the larger proportion of persons who gave such checks had no account or funds at the bankers upon whom the checks were drawn, and gave the checks with the understanding that the same were not to be presented for payment, or paid; that they have not been paid, nor anything realized thereon by the company, and that none of the subscribers to the said articles of association have ever paid anything upon their subscriptions for stock.

At the request of the plaintiff the referee also found that the defendant attended the meeting at which the articles of association were signed and took a leading part in conducting the same and in procuring subscriptions for stock and was cognizant of the proceedings to organize said company and advised as to the requirements of law to effect such organization and advised that the ten per cent required by law to be paid in cash could be paid in checks; that at the time said articles of association were signed and subscriptions made, it was not intended by the defendant and others controlling said meeting and procuring said subscriptions, that the sums subscribed should be paid, but it was intended and expected, and so publicly stated by the defendant, that after the articles should be filed in the office of the secretary of state, proceedings would be taken by the taxpayers of the towns through which the railroad was to be constructed, to bond those several towns to raise the necessary amount of money to construct the road, and that after the filing of the articles on the 28th of February, 1870, and before any contract had been made for the construction of the proposed railroad, the defendant, then being vice-president and acting president of said pretended corporation, and well knowing the facts before stated, procured

petitions to be signed by taxpayers of the town of Attica to be presented to the Supreme Court with his name indorsed thereon as attorney for the petitioners, and caused such petition to be presented to said court, and controlled said proceedings which resulted in the bonding of the town, and that he testified before the referee appointed therein, among other things, that the said company had been regularly organized and officers and directors elected, and that he procured two persons named to be appointed railroad commissioners of said town. That he afterwards, about September 1, 1875, sold $6,600 of said bonds to *bona fide* purchasers at par and interest accrued, and received the money therefor, but the referee found that such sale was made for the company, and that the defendant accounted to the company therefor. He also found that said purchasers bought said bonds in good faith and upon the assurance of the defendant that they were good and valid debts against said town and were legal and valid securities.

The second ground upon which it is claimed that the bonds had become voidable after their issue and before their sale, is that, as found by the referee, the pretended railroad corporation did not, within five years after its articles of association were filed and recorded in the office of the Secretary of State, begin the construction of its road, or expend thereon ten per cent of its capital.

It appears from the findings that the articles were filed and recorded February 28, 1870. The proceedings for bonding the town were instituted under chapter 907, of the Laws of 1869. The petition, signed by a majority of the taxpayers, was dated June 9, 1873, the defendant appearing as attorney for the petitioners. A referee was appointed August 12, 1873, and judgment entered October 29, 1873, appointing three commissioners with power to execute bonds of the town of Attica, to the amount of $20,000, and invest the same or the proceeds in the stock of the Attica and Arcade Railroad Company. By virtue of that judgment the commissioners, in March, 1874, made and delivered to the Attica and Arcade Railroad Company town bonds to the amount of $20,000 in

payment of their subscription in behalf of the town for 220 shares of the stock of the company.

Assuming these bonds to have been legally issued in the first instance, it is claimed that they ceased to be valid in the hands of the company or its officers, on the 28th of February, 1875, by reason of the termination of the corporate existence of the company. Yet they were not sold by the defendant until about September 1, 1875, at which time they were transferred by him to *bona fide* holders, and the town thus made liable thereon, as was decided by the United States Circuit Court.

The question of the validity of the bonds at the time they were issued, in the hands of any but a *bona fide* holder, will first be considered.

The general railroad act requires as a condition precedent to the formation of a railroad corporation, that at least $1,000 for every mile of railroad proposed to be constructed shall be subscribed and ten per cent paid thereon in good faith and in cash, and provides in terms that the articles of association shall not be filed and recorded until those conditions have been complied with, nor until the affidavit required has been annexed to the articles, and that *on compliance with those conditions* the subscribers and all persons who shall become stockholders shall be a corporation. It cannot be questioned that in the absence of such compliance the mere filing of articles of association would not constitute a corporation *de jure*, nor can it be doubted that the proceedings by which the company purported to organize as a corporation were a gross fraud upon the railroad act and would be adjudged void in any proceeding in which they came directly in question. Neither can it be disputed upon the facts found that the defendant was a party to such fraud. The bonding act of 1869 (Laws of 1869, chap. 907), under which the bonds in question purport to have been issued, is entitled " An act to amend an act to authorize the formation of railroad corporations and to regulate the same, passed April 2, 1850, so as to permit municipal corporations to aid in the

construction of railroads," and provides for creating bonds and investing the same or the proceeds thereof, in the stock or bonds of such railroad company in this State as may be named in the petition of a majority of the taxpayers. The existence of a railroad corporation having power to issue stock or bonds to be given to the municipal corporation, and to construct the road to be aided, therefore lies at the foundation of the power to issue municipal bonds. It cannot be pretended that authority could be obtained under that act to issue town bonds to any unincorporated set of individuals who should undertake to style themselves a railroad company, nor that the mere filing of pretended articles of association in the office of the secretary of State without compliance with any of the other requirements of the general railroad law, would constitute those whose names were attached to such articles a corporation. Articles filed, with an intentionally false affidavit of such compliance, would have no more actual validity than if the names of the subscribers had been forged.

The learned referee in his opinion says that, so far as the case shows, the petitioners here were as well acquainted with the facts relating to the organization of the Attica and Arcade Railroad Company, and its financial condition at the time they signed the petition, as the defendant; and that, so far as any claim for damages against the defendant in this action is concerned, unless some fraudulent act of the defendant induced the petitioners to sign, the defendant would not be liable any more than if he had asked an individual to subscribe for the stock; and that mere knowledge of the fact that the company had not been legally organized, unaccompanied by any fraudulent representation, would not be sufficient, although he concedes that if a town or an individual should be induced by false or fraudulent representations to subscribe for stock and part with his or its money, an action would undoubtedly lie for the fraud, but that such was not the case here. It seems to me that the reasoning of the learned referee is fallacious. In the first place there is nothing to show that the taxpayers who signed the petition to bond

the town had any knowledge of the fraudulent character of
the pretended organization, or of the falsity of the affidavit
annexed to the articles of association, and no such fact is
found; nor is there anything but mere surmise to lead to the
conclusion that they had such knowledge. All that appears
is, that to the articles of association, publicly filed and referred
to in the petition, was attached the affidavit of the defendant
and two other persons; and all that the petitioners could be
presumed to have known is that the law required such an
affidavit. But supposing that the petitioners had known that
the affidavit was false, that knowledge would not be material
to this case. By procuring the town to be bonded the peti-
tioners imposed a burden not merely on their own property,
but also on that of the taxpayers who did not sign the
petition or approve the scheme, and who were at liberty to
contest the validity of the bonds, until the defendant, by
wrongfully transferring them to *bona fide* holders, with
knowledge of their actual invalidity, and on his assurance
to the purchasers that they were valid securities, deprived
the town, and the taxpayers who had not consented to the
bonding, of the power to avail themselves of the defense,
according to the doctrine held by the United States courts
in respect to *bona fide* holders of town bonds. It was for
that wrong that this action was brought.

I think that if the holders of the bonds had not been fur-
nished by the acts of the defendant with the shield which
has thus been thrown around *bona fide* holders of town bonds,
the town would have had a good defense to the bonds in any
court on both of the grounds now taken by the counsel for
the plaintiff. The pretended railroad corporation was a
mere sham, apparently gotten up for the express purpose of
obtaining an issue of town bonds without putting up the cash,
which the statute required as a guaranty of the *bona fides* of
the proposed undertaking, and as a security to those dealing
with or lending their credit to the corporation to be formed;
and it is inconceivable that any court of justice would allow
bonds obtained by such a fraud to be enforced against the

town by the very persons composing this fraudulent organization, and who had paid no value for the bonds.

I think that the second ground upon which the bonds are claimed to have become invalid before they were negotiated by the defendant is also well taken.

Assuming that the Attica and Arcade Railroad Company ever had legal existence as a corporation, and that the bonds were lawfully issued and delivered to it, still they were issued for the purpose of aiding in the construction of the proposed railroad, and in consideration of stock of the company issued to the town in payment for the bonds. The company instead of using the bonds to aid in the construction of the road, and thus giving value to the stock which it had issued to the town in payment, laid by for years after the bonds were issued and did not begin the construction of the road within the five years prescribed by the statute, and by this default caused its corporate powers and franchises to cease and terminate, thus losing the power to construct the road or to acquire the right of way, and depriving the stock which it had issued to the town of any value.

The act of 1867 (Chap. 775) provides that if any corporation formed under the general railroad law of 1850, shall not within five years after its articles of association are filed and recorded in the office of the Secretary of State, begin the construction of its road and expend thereon ten per cent on the amount of its capital, or shall not finish its road and put it in operation in ten years from the time of filing its articles of association as aforesaid, its corporate existence and powers shall cease.

It was decided by this court in the *Matter of the B. W. & N. R. Co.* (72 N. Y., 245), that these provisions of the statute executed themselves, and that when a company omitted to begin the construction and expend the prescribed ten per cent of its capital within the five years, it ceased to exist and became extinct without any judicial procedure to declare or complete the forfeiture of its corporate powers; that the legal existence of a corporation authorized to construct a railroad

lay at the foundation of the right to take property for its use (as I contend it lies at the foundation of the power of a town to issue bonds to aid in the construction of a railroad) and that any person whose lands were sought to be appropriated to the use of a railroad company, could assert this extinction of its corporate rights.

It is claimed in the respondent's brief that the act of 1875 (Laws of 1875, chap. 598) passed June 18, 1875 (after the forfeiture and before the negotiation of the bonds by the defendant) cured this forfeiture, but it is very clear that that act has no application to this case. The act of 1867 declared two defaults, either of which would terminate the existence of the company : (1st.) The failure to begin the construction and expend ten per cent of the capital within five years ; and (2d), the failure to complete the construction within ten years. It was only to the second default that the act of 1875 applied. It relieved companies that for any cause had been unable to construct their road within the time limited, by providing that the time for the *completion* of the road should be extended for a further term of two years beyond the time theretofore limited, and that failure theretofore to construct the road should not cause a forfeiture of the corporate powers. Corporations that had been unable to complete their roads stood on a very different footing from those that had omitted for five years even to begin the construction. These were not either within the letter or the equity of the act, and it is evident that those whose rights had become extinct by reason of their omission to *begin* the construction were not intended to be resurrected, as the concluding sentence of the act declares that nothing therein contained shall have the effect to revive any corporation whose corporate power has been forfeited for any cause.

It thus appears that in September, 1875, when the defendant transferred the bonds to *bona fide* holders, assuring them that they were valid obligations, the pretended corporation, if it had ever had any existence, had become extinct ; the stock which had been issued to the town had become worthless ; the

company had lost all power to construct the road, and the purpose for which the bonds had been issued had wholly failed. Who can contend that under these circumstances the bonds in the hands of the sham and defunct corporation, or of those who had been its pretended officers, could have been enforced against the town.

I think the conclusion is irresistible that in the hands of the defendant, or of the fraudulent and defunct organization for which he claims to have been acting, the town had a valid defense to the bonds; that the defendant well knew this, and all the facts, and could have been restrained by injunction from transferring the bonds to *bona fide* holders, and could have been compelled to surrender the bonds to the town. No such injunction, however, was obtained, nor does it appear that the town or the taxpayers, had any cause to apprehend that the defendant would so transfer the bonds. He made the transfer to *bona fide* purchasers and received the proceeds, and the town was by this act, according to the decision of the United States Circuit Court, and the law as declared by the federal courts, made liable to pay the bonds, and was compelled to pay them, and the question now before us is whether the town has any redress against the defendant. It seems to us that on the principles enunciated in *Comstock* v. *Hier* (73 N. Y. 269 and cases there cited), the facts found do show a liability on the part of the defendant to the town.

In *Comstock* v. *Hier* it appears that the plaintiff had indorsed a promissory note made by the firm of Jaycox & Green, payable to the order of the plaintiff, for the accommodation of the makers, and under an agreement between the plaintiff and the makers that it should be used only for the purpose of taking up a prior note indorsed in like manner; but the makers, instead of using the note as agreed, transferred it to the defendants as collateral security for an antecedent debt, the defendants parting with no value on receipt thereof. The defendants transferred the note before maturity to a *bona fide* holder for value, and thus deprived the plaintiff of the defense which he would otherwise have had to an action on his indorsement. The holder

accordingly recovered judgment against the plaintiff as indorser, which judgment the plaintiff paid and then brought his action against the defendants. The makers had become bankrupt. This court decided that the plaintiff was entitled to maintain the action. Several propositions were adjudged: 1st. That on these facts the plaintiff would have had a perfect defense to an action by the present defendants against him as indorsee of the note, it having been diverted from the purpose for which the indorsement had been made, and they not being *bona fide* holders for value. 2d. That the defendants had no better title to the note and indorsement than Jaycox & Green had, and that the plaintiff could have reclaimed it and in equity prevented its negotiation. 3d. That the defendants had no right to secure to themselves the full benefit of the defendant's indorsement, and all the advantages of *bona fide* indorsees for value, by negotiating the note to an innocent transferee for value before maturity. 4th. That having no legal title, as against the plaintiff, to the note and indorsement, they had no right to transfer it, and the sale of it by them was a conversion; that the defendants could not fortify their title by a sale of the note, and the title to the proceeds was the same as to the property before the sale. 5th. That the plaintiff was the actual owner of the note, it never having been lawfully transferred and the defendants could not have resisted an action by the plaintiff for its surrender to him; that he had an election of remedies, trover for the conversion of the note or an action for money had and received for the proceeds of the discount, and that the complaint contained the necessary averments to sustain an action in either form.

On these grounds a decision in favor of the defendants rendered by the Supreme Court was reversed. That case seems to me decisive of the present one. At the time the defendant sold the bonds (September, 1875) the actual title to them was not in the so-called railroad company nor in the defendant. The so called company had never acquired the legal power to receive or hold them; but if it had ever acquired such power it had become extinct by the termination

of its alleged corporate existence, and of its power to use them for the purpose for which they had been made. The town was under no legal obligation to pay them while they were in the hands of the defendant, but might be subjected to such a liability by their being transferred to a *bona fide* holder for value, and could, therefore, have enjoined their negotiation by the defendant and compelled their surrender. In this respect the case is also similar to that of *Thayer* v. *Manley* (73 N. Y. 305) and *Decker* v. *Mathews* (12 id. 313). In the last named case the plaintiff had made his own note, payable to the order of J. and indorsed by him. The note was made and indorsed for the accommodation of J. & Co., and for the purpose of being discounted by them at the Manhattan Bank and the proceeds applied to the payment of other notes previously made and indorsed by the same parties. The bank refused the discount, and the purpose for which the note had been made thus failed, and J. & Co. put it in their safe from which it was taken by the defendant Mathews, and by him discounted at another bank without the consent of any of the parties. It was held that the plaintiff was entitled to recover against Mathews; that the note was of no value when Mathews took it from the safe, but by the act of passing it to a *bona fide* holder it became valuable and the plaintiff became liable to pay it, and his cause of action accrued immediately upon his becoming liable upon the note and before payment, and that he was entitled to recover against Mathews the face of the note for which he had thus been made liable.

So in the present case the bonds were of no value in the hands either of the pretended company or of the defendant; and immediately upon their being negotiated by the defendant a cause of action accrued against him, either in the nature of an action of trover for the face of the bonds, or, as held in *Hier* v. *Comstock*, for money had and received for the amount realized from the sale, he having obtained the money on the liability of the town thus created by him. I can see no way of avoiding this conclusion without overruling the two cases last cited. Whether anything transpired after the

sale of the bonds to relieve the defendant from the liability he had thus fixed upon himself will now be considered.

The learned referee finds that the defendant accounted to the alleged railroad company for the proceeds of the bonds. It is not even found, nor does it appear, that he paid over the proceeds, or expended them for the use of the pretended company, but simply that he accounted, which may mean that he rendered an account acknowledging the receipt, but may have still retained the fund or applied it to his own use. But suppose he had actually paid over the proceeds of the bonds to some person as the representative of the pretended corporation, the case would not be changed. In the first place there never was such a corporation, but only a combination of persons organized for the very purpose of subjecting the town to this liability; and he was a leading member of this combination, and the party through whose perjury it had attempted to clothe itself with the character of a corporation; and if he had handed over the proceeds to one of his associates in that combination, he could not thereby have discharged himself. Secondly. If the fraud in the organization could be held to have been so far successful as to clothe this combination with corporate powers, those powers had become extinct by the terms of the statute, before the defendant sold the bonds and received the proceeds; and the town itself had no power to advance money to it and create a charge upon the taxpayers, or to make itself liable for advances made to it by others.

The main reliance of the learned referee, outside of his conclusion that the defendant was not liable, on the ground of fraud, for the part taken by him in organizing the pretended company and procuring the issue of the town bonds, was upon chapter 577 of the Laws of 1880, passed June 22, 1880, which, in his opinion, conferred upon the Attica and Arcade Railroad Company a valid title to the bonds, and the legal right to enforce them, so far as the validity of that organization could confer that right, and cured all defects in that organization; and also relieved the company of all for-

feitures by reason of its failure to comply with the require-
ments of law relating to the construction of railroads by
companies formed under the general act.

If I am right in the conclusion that in September, 1875, a
right of action had accrued in favor of the town, against the
defendant, for the proceeds then received by him on the sale
of the bonds to *bona fide* holders, it is difficult to see how
that right of action could be taken away by an act of the
legislature passed in 1880, especially when the act cited, even
if constitutional in other respects, does not purport, even, to
have that retroactive effect.

Section 1 of that act purports to release the Attica and
Arcade Railroad Company from the forfeiture of its charter
by reason of its failure to begin the construction of its road
and expend thereon ten per cent of its capital within five
years after the articles of association were filed and recorded
in the office of the Secretary of State, and also by reason of
its failure to finish said road and put it in operation within
ten years from the time of its so filing and recording its
articles of association.   Section 2 declares that said company
shall possess all the powers and rights it would have possessed
in case all its acts and proceedings had been in conformity
with the provisions of the general railroad act of 1850, and
the acts amending the same, and section 3 authorizes said
company to construct its road with a three-foot gauge.   It
contains no provision purporting to legalize any town bonds
previously issued in aid of the construction of the road, nor
discharging any person from any liability incurred in con-
nection with any such bonds.   It speaks wholly in respect to
the future and purports only to vest the company with the
powers which it would have had if it had been duly incorpo
rated and had not forfeited its charter, and legalizes none of
its past acts.   But this statute is clearly violative of section
18, article 3 of the constitution, which took effect January 1,
1875, and prohibits the legislature passing any local or private
bill granting to any corporation, association or individual the
right to lay down railroad tracks.   In one point of view the

company had never had any previous legal existence, not having complied with the provisions of the general railroad law for its organization. But passing this point and assuming that it had had such existence, such corporate existence had become extinct by the expiration of the limitation contained in section 47 of the general act as amended by chapter 575 of the Laws of 1867. It had been extinct for more than five years before the passage of the act of 1880, and that act was an attempt to create a new corporation under the guise of reviving and rehabilitating a defunct corporate body. It was therefore void and inoperative for any purpose. This precise point was expressly adjudicated in *Matter of B. W. & N. R. Co.* (75 N. Y. 335, 339).

The court at General Term, in reviewing the decision of the referee, do not undertake to sustain by any reasoning his ruling that the bonds were valid, but assuming that they were void while in the hands of the company, and that the stock for which they were exchanged was worthless, and that the bonds were therefore without consideration, and that the commissioners might have been restrained from disposing of them, and also that, after their issue, the company and the defendant as its officer and agent might have been restrained from negotiating them, yet holds that the defendant, having received them as the president of the company, for its use, and having sold them for the company at par for cash, and accounted to the company therefor, the only authority he had over the bonds and the only duty he was under in respect to them was as the officer or agent of the company, and there was no ground upon which he was responsible to the town for his agency in selling the bonds after they had been delivered to the company by the commissioners.

This position has been, in my judgment, already answered by the cases referred to. In the case of *Comstock* v. *Hier*, the defendants received the note indorsed by the plaintiff, not from him but from the payees, and it could have been said that they owed no duty to the plaintiff in respect thereto. In that case it did not even appear that the defendants knew of

any infirmity in the note or indorsement, or that in transferring it to a *bona fide* holder they were doing any wrong to the plaintiff, or imposing any liability upon him which he had not already incurred, yet it was held that, as by such transfer they subjected the defendant to liability, they were responsible to him for the proceeds of the transfer or for the amount for which they had subjected the defendant to liability. In that respect the present case is stronger against the defendant than *Comstock* v. *Hier*, for here he had full knowledge that the town was not liable upon the bonds and that by negotiating them he rendered it liable and deprived it of its defenses. But the other facts in the case also preclude his assuming the position of an innocent agent dealing for a responsible principal on whom the liability should rest. In fact he had no principal. There was no existing corporation that could be held responsible for his acts. His assumed principal was a mere combination of individuals who, by his own fraudulent acts, had clothed themselves with the name of a corporation, and even this pretended body had become extinct before the sale. If the defendant was not liable no one was. In such a case a party cannot claim protection under any principle of the law of agency.

All the facts of the case considered together show that the sale of these bonds, which was the act which created a liability on the part of the town, was but the consummation of the fraudulent scheme to bond the town without putting up the money required for the legal organization of a railroad corporation, to which scheme the defendant was, at least, a party, if not the prime mover in it.

I have discussed every point made, either in the opinions of the referee or of the court or in the brief of counsel, in support of the defense. In my judgment none of these points are tenable and the dismissal of the complaint cannot be sustained.

At the conclusion of the findings of the referee, there is a finding that after the transactions hereinbefore detailed and in the year 1880, a company was organized under the name of the

Tonawanda Valley Railroad Company, and that the Attica and Arcade Railroad Company transferred its assets and franchises to that company, and that in the same year the majority of the railroad commissioners of the town of Attica exchanged $11,800 of new bonds of the town of Attica for that amount of bonds made and delivered to the Attica and Arcade Railroad Company and also received for the said town of Attica $20,000 of the stock of the Tonawanda Valley Railroad Company. The precise bearing of these facts does not appear, the testimony not being contained in the case, and the finding not having been explained in the brief of counsel, but it has been suggested that in some way the town of Attica by these transactions may have saved itself in whole or in part from the loss sustained by the acts of the defendant. If on a new trial it should be made to appear that the loss of the town has been reduced in any such way, the defendant should have the benefit of such reduction in mitigation of the damages for which he is liable.

The judgment entered upon the report of the referee, and the affirmance of that judgment by the General Term should be reversed, and a new trial ordered, with costs to abide the event.

EARL, DANFORTH, and PECKHAM, JJ., concur; RUGER, Ch. J., ANDREWS and FINCH, JJ., do not vote.

Judgment reversed.